**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DISCOVER RE MANAGERS, INC. and | : | |
| DISCOVERY MANAGERS, LTD., | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | 3:05-CV-809 (WWE) |
| | : | |
| PREFERRED EMPLOYERS GROUP, INC., | : | |
| | : | |
| Defendant. | : | |

**RULINGS ON PENDING MOTIONS**

The underlying motions arise from plaintiffs Discover Re Managers, Inc. and Discovery Managers, Ltd.'s (collectively, "Discover") action to recover monies allegedly due and owing to them by defendant Preferred Employers Group, Inc. ("PEGI"). Discover alleges eight claims against PEGI: 1) breach of contract; 2) conversion; 3) civil theft; 4) unjust enrichment; 5) a violation of Florida Statute § 626.561; 6) breach of fiduciary duty; 7) breach of the covenant of good faith and fair dealing; and 8) a violation of the Connecticut Unfair Trade Practices Act, C.G.S. § § 42-110a, et seq. Discover now moves for partial summary judgment as to liability only upon Count One: breach of contract or, in the alternative, Count Four: unjust enrichment.  In turn, PEGI moves to strike the affidavit of Jeffrey L. Fisher.  Discover has filed a separate motion to seal the motion to strike and cross-moves for equitable relief.  Additionally, an affiliate of PEGI, PEG Reinsurance Company, Ltd. ("PEG Re") moves to intervene as a party to this action.

1

**BACKGROUND**

Discover underwrites various types of insurance policies for alternative risk groups and associations.  In the course of underwriting such insurance coverage, Discover assigns some underwriting and administrative functions to third-party managers.  PEGI is one such manager.  In that capacity, PEGI performs underwriting, administrative and compliance functions for various risk groups and associations insured by Discover.

On May 31, 1999, Discover and PEGI entered into an Underwriting Administrative Agreement (the "Underwriting Agreement").[1]   The Underwriting Agreement named Discover as the "Company" and PEGI as the "Manager."

In accordance with the Underwriting Agreement, PEGI assumed specific obligations, including: 1) collecting premiums from the insureds; 2) providing Discover monthly activity reports detailing premium account information; and 3) remitting, on a monthly basis, the collected premium payments to Discover.  Underwriting Agreement, § IV(A).  The Underwriting Agreement specifically stated that all premiums collected by PEGI were Discover's property, and that PEGI's failure to pay Discover for any collected premiums could result in Discover obtaining an injunction, with PEGI bearing attorneys' fees and costs.  Id. at § § IV(A) and IV(B).  The Underwriting Agreement

---

[1]PEGI contends that this Underwriting Agreement was not finalized until some time after March 20, 2000.  The first sentence of the Underwriting Agreement states that the Agreement was entered into on May 31, 1999.  On November 15, 1999, a document entitled "Addendum No. 2" was added to the Underwriting Agreement.  This Addendum appears to modify the authority provided to, and services provided by, PEGI.  It also alters the fee for services provided.  There are, however, no records which would infer that the Underwriting Agreement was not finalized or was not effective prior to March 2000.

further provided that PEGI hold in trust all sums of money collected.  Id. at § IV(B).  In

consideration for PEGI's services under the Agreement, PEGI was allowed to retain a

commission before remitting the remainder of the collected premiums to Discover.  Id.

at § VII.

Discover alleges that PEGI collected premiums from insureds in accordance with

the terms of the Underwriting Agreement, but since at least October 2002, has failed to

remit the collected premiums to Discover.

## DISCUSSION

**I.      Plaintiffs' Motion for Partial Summary Judgment**

A motion for summary judgment will be granted where there is no genuine issue

as to any material fact and it is clear that the moving party is entitled to judgment as a

matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "Only when

reasonable minds could not differ as to the import of the evidence is summary judgment

proper."  Bryant v. Maffucci, 923 F. 2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849

(1991).

The burden is on the moving party to demonstrate the absence of any material

factual issue genuinely in dispute.  American International Group, Inc. v. London

American International Corp., 664 F. 2d 348, 351 (2d Cir. 1981).  In determining

whether a genuine factual issue exists, the court must resolve all ambiguities and draw

all reasonable inferences against the moving party.  Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 255 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, then summary judgment is appropriate. <u>Celotex Corp.</u>, 477 U.S. at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. <u>Anderson</u>, 477 U.S. at 24.

Here, plaintiffs claim that they are entitled to summary judgment on Count One of the complaint: breach of contract or, in the alternative, Count Four: unjust enrichment. Defendant argues that it has not breached any of its obligations under the Underwriting Agreement and has not been unjustly enriched from its management of same.[2] Furthermore, defendant claims that plaintiffs erroneously insist on viewing the Underwriting Agreement as the sole element of the more complex relationship of the Underwriting Agreement and a certain Reinsurance Agreement between the parties and their affiliates. Defendant claims that the Underwriting Agreement is only a part of the Alternative Risk Program (the "Program") and that plaintiffs fail to consider the contract in its entirety and the interrelated disputes arising therefrom.

The gist of defendant's argument is that one may not consider the Underwriting Agreement in a vacuum. It asserts that the Underwriting Agreement is operative only in conjunction with the Reinsurance Agreement which plaintiffs' affiliate, Discover Reinsurance Company ("DR"), and defendant's affiliate, PEG Re, executed on November 15, 1999. Contrary to defendant's contention, the Court adheres to the

---

[2]Defendant refers to the Underwriting Agreement as the "Administrative Agreement." For consistency and clarity, the Court will delineate this document as the "Underwriting Agreement" pursuant to plaintiffs' motion for partial summary judgment.

findings on the issue contained in the recommended ruling of Magistrate Judge Fitzsimmons dated March 1, 2006, which the Court adopted on April 3, 2006.  In that ruling, the Court held that there was no support for defendant's assertion that the Underwriting Agreement is not operative without the Reinsurance Agreement.

First, the Underwriting Agreement was entered into on May 31, 1999, nearly six months prior to the execution of the Reinsurance Agreement.  The Underwriting Agreement provided defendant with immediate rights and obligations to collect premiums on behalf of plaintiffs.  There was no language in the Underwriting Agreement deferring those rights and obligations until after the execution of the Reinsurance Agreement.  Furthermore, plaintiffs' claims in this litigation arise solely with regard to the rights and obligations of defendant to collect premiums in accordance with the Underwriting Agreement.  This litigation does not relate to any of the rights or duties of defendant's affiliate, PEG Re, arising out of the Reinsurance Agreement.

Secondly, the parties to the Underwriting Agreement are different from the parties to the Reinsurance Agreement.  The Underwriting Agreement was a contract entered into by plaintiffs, Discover, and defendant, PEGI. The Reinsurance Agreement was a contract entered into by DR and PEG Re. The fact that the parties to the Reinsurance Agreement are affiliates of the parties to the Underwriting Agreement is of no relevance to the terms of the Underwriting Agreement.

Finally, after examining both agreements, the Court finds that neither agreement references the existence of the other.  Accordingly, the Court finds that the Underwriting Agreement is a contract independent of the Reinsurance Agreement.

All parties to this litigation are sophisticated businesses in the insurance industry. If the parties intended to incorporate the Underwriting Agreement into the Reinsurance Agreement, or vice versa, the contracts would have explicitly established same.

## 1.    Breach of Contract

Pursuant to Connecticut law, "[t]he elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." Rosato v. Moscardo, 82 Conn.App. 396, 411 (2004) (quoting Bouchard v. Sundberg, 80 Conn.App. 180, 189 (2003)).[3]  It is undisputed that the first and second prongs of the test are met: the Underwriting Agreement explicitly sets forth duties and obligations between the parties and, until at least October 2002, the parties performed accordingly.  Plaintiffs now move for summary judgment on their breach of contract claim.  Defendant argues that plaintiffs have not fully performed their obligations under the Underwriting Agreement, that plaintiffs therefore breached the agreement and that they have not proven damages.

The Underwriting Agreement imposed three obligations on plaintiffs:

> OBLIGATIONS OF COMPANY
> A.    Company shall provide Manager with the pro forma copy of the authorized forms and endorsements.  Company shall also provide Manager with other printed material reasonable and necessary for Manager to accomplish its duties with respect to this Agreement and the insurance issued hereunder.  Company shall not be responsible for, nor bear the expense of other printing, advertising or promotional materials.

---

[3]Pursuant to Section XVII of the Underwriting Agreement, the parties agreed that the "Agreement shall be governed by and construed in accordance with the laws of the state of Connecticut without regard to its rules regarding conflict of laws."

B.    Company shall provide Manager with a functional rating and policy issuance system.

C.    . . . . Company agrees to obtain filings and to secure all approvals necessary to the undertakings contemplated by this Agreement.

Underwriting Agreement, § V.

Defendant has not presented any evidence in support of its contention that plaintiffs failed to fulfill these obligations.   "[T]he mere possibility that a factual dispute *may* exist, without more, is not sufficient to overcome a convincing presentation by the moving party.  See Gatling v. Atlantic Richfield Co., 577 F.2d 185, 187-88 (2d Cir. 1978), *cert. denied*, 439 U.S. 868, 99 S.Ct. 181, 58 L.Ed.2d 169 (1979).  The litigant opposing summary judgment, therefore, 'may not rest upon mere conclusory allegations or denials' as a vehicle for obtaining a trial." Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980) (quoting SEC v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978)).

Defendant's argument is: "Plaintiffs have had an affirmative duty to work in good faith and deal fairly with the Defendant . . . . The Plaintiffs have not done this."  Def.'s Opp., 11.  Defendant refers "generally" to the Counter Affidavit of William R. Dresback, Senior Vice President and Chief Financial Officer of PEG Re, as evidence of this assertion.  However, the Dresback affidavit is premised on the argument that the Underwriting Agreement does not stand alone but is only a part of the global agreement allegedly established by virtue of the Reinsurance Agreement between DR and PEG Re.  As previously noted, the Court has found that there is no comprehensive relationship between the Underwriting Agreement and the Reinsurance Agreement.

7

Accordingly, the Dresback affidavit presents no evidence that plaintiffs did not fulfill their obligations under the Underwriting Agreement.

As to defendant's assertion that it has not breached the Underwriting Agreement, the Court finds its argument unavailing.  Again, defendant's contention is based on its argument that the Underwriting Agreement cannot be read in isolation.  Its references to the "Operational Period" and "Runoff Period" have no relation to the terms established by the Underwriting Agreement and, therefore, cannot be used to counter plaintiffs' claim that defendant failed to perform its duties under the Underwriting Agreement.  The Underwriting Agreement specifically set forth defendant's continuing obligation to provide plaintiffs with monthly activity reports and to remit the premiums to plaintiffs.

> OBLIGATIONS OF THE MANAGER
> Manager shall provide Company with a detailed activity report(s) ("Activity Report") within twenty (20) days from the end of each month setting forth all of the Subject Business issued by or through Manager during the prior month.  The Activity Report shall also set forth all of the premium accounting information for all Subject Business issued by Manager during such month.  The balance due as shown in the Activity Report shall be paid within twenty five (25) days of delivery of the Activity Report to the Company. . . .

Underwriting Agreement, § IV(A).  Defendant's obligations were to be continued even after termination of the Agreement.  Underwriting Agreement § III(E).

Plaintiffs present evidence that defendant breached the contract by failing to remit all monies owed pursuant to the Underwriting Agreement.  In the Jeffrey L. Fisher ("Fisher") Affidavit,[4]  Fisher, the Vice President and Corporate Counsel of Discover,

---

[4]Defendant moves to strike the Affidavit, which the Court will decline to do.  See discussion, *infra*.

testified that defendant has failed to remit premiums to plaintiffs since at least October 2002.  Pursuant to an October 11, 2004 e-mail from Ramon de Legorburu of PEGI to Craig Tirrell of Discover, defendant conceded that it owes plaintiffs at least $1,189,009 in collected premiums.  Fisher Aff., Ex. B.  Furthermore, de Legorburu asserted in the e-mail that defendant had two full-time employees working on the "reconciliation process" between plaintiffs and defendant.  This e-mail provides evidence to establish that defendant failed to remit premiums to plaintiffs, specifying the amount of its debt. In contrast to the conclusory statements contained in the Dresback affidavit, this specific evidence in Fisher's affidavit gives credence to plaintiffs' argument as to defendant's breach.

Because plaintiffs have established that defendant breached its duty pursuant to the Underwriting Agreement, they satisfy the third prong necessary to satisfy the breach of contract test.

As for the fourth prong of the test, defendant argues that plaintiffs fail to satisfy any claim for damages.  It asserts that plaintiffs do not allege any loss and, therefore, it is not liable to plaintiffs.  The Court disagrees.

The Second Circuit has ruled on a lost profits standard of proof by specifically quoting from and adopting the language of a New York court that

> Lost profits may be recovered if it is 'first . . . demonstrated with certainty that such damages have been caused by the breach.  Second, the damages must be capable of proof with reasonable certainty.  In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes.  Finally, there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made.'

Care Travel Co., Ltd. v. Pan American World Airways, Inc., 944 F.2d 983, 994 (2d Cir. 1991) (quoting from Kenford Co. v. County of Erie, 67 N.Y.2d 257, 261 (1986)).

Plaintiffs satisfy this test. Plaintiffs lost profits due to defendant's failure to perform its responsibilities pursuant to the Underwriting Agreement. Specifically, by failing to remit the premiums collected, defendant breached the terms of the Agreement. Secondly, the damages claimed are specifically delineated in the e-mail sent by an employee of defendant to an employee of plaintiffs; to wit: "Net premiums unpaid $1,189,009." Fisher Aff., Ex. B. Third, the parties specifically considered the damages as expressed in the terms of the contract: "If Manager willfully fails to pay Company any premiums or monies due, then Company shall be entitled to obtain an injunction, and the cost and expenses thereof, including attorneys' fees, shall be borne by Manager." Underwriting Agreement, § IV(A).[5]

Because plaintiffs satisfy all four prongs of the test for breach of contract, the Court finds that defendant breached the Underwriting Agreement and is liable to plaintiffs for same. Accordingly, the Court will grant plaintiffs' motion for summary judgment as to Count One. The Court, therefore, will not consider plaintiffs' alternate argument of unjust enrichment (Count Four).

---

[5]The Agreement also provided that: "Manager agrees that the delegated functions described in this Agreement will be performed strictly in accordance with the terms and conditions of this Agreement." Underwriting Agreement, § II(D); "No right or remedy set forth in this Agreement is exclusive of any other right or remedy, but shall be in addition to every other right or remedy given under this Agreement or existing now or hereafter at law or equity." Id. at § XIII.

10

**II.**     **Defendant's Motion to Strike**

Defendant moves to strike Fisher's affidavit, claiming that the affidavit is based on information that is not within his personal knowledge and should therefore be stricken from the record.  Plaintiffs counter that the affidavit is based on Fisher's personal knowledge and, furthermore, that the evidence presented by defendant in support of its motion to strike is related to the arbitration proceeding set forth in the Reinsurance Agreement and is entirely irrelevant to the matter before the Court today.

It is well established that an affidavit must be based on the personal knowledge of the affiant.  Rule 56(e) provides that: "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e).  "A court may therefore strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements."  Hollander v. American Cyanamid Co., 172 F.3d 192, 198 (2d Cir. 1999), *cert. denied*, 528 U.S. 965, 120 S.Ct. 399, 145 L.Ed.2d 311 (1999) ("Hollander II") (affirming district court's striking portions of plaintiff's affidavit based on the finding that the affidavit "flagrantly disregarded the requirements of Rule 56(e)," was "riddled with inadmissible hearsay, conclusory statements and arguments, and information clearly not made on the affiant's personal knowledge," and "more resembled an adversarial memorandum than a *bona fide* affidavit.") (quoting Hollander v. American Cyanamid Co., 999 F.Supp. 252, 256 (D.Conn. 1998) ("Hollander I")).  See also Keene v. Hartford Hospital, 208 F.Supp.2d

238, 243-45 (D.Conn. 2002) (striking portions of affidavit that were not based on personal knowledge).

In keeping with the Second Circuit's holding in Hollander II, defendant claims that Fisher's affidavit does not comply with Rule 56(e) because it is not based on his personal knowledge.  Defendant contends that Fisher's testimony consists of no more than generalized and conclusory statements and does not demonstrate his personal knowledge of the subject litigation.  The affidavit refers to letters between counsel for plaintiffs and defendant that defendant claims constitute recognition by plaintiffs that Fisher lacks personal knowledge of the Underwriting Agreement and the issues of this litigation.  Defendant further posits that Fisher's reliance on the e-mail correspondence between representatives of plaintiffs and defendant as a means to bolster his testimony of defendant's alleged wrongdoing is erroneous because the e-mail is hearsay and would not be admissible in court.

In response to defendant's claim that Fisher's affidavit is not based on personal knowledge and should be stricken, Fisher submitted a supplemental affidavit on May 17, 2006.  In this affidavit, he clarifies that his knowledge of events is based on his "personal knowledge gained through the ordinary course of [his] duties at Discover." "Specifically, my statements . . . are based on my review of the Underwriting Administration Agreement . . ., my review of the Plaintiffs' business records and correspondence with the Defendant . . ., and most importantly, my repeated attempts over the past two years to collect the unpaid premium from the Defendant."  Fisher Supp. Aff. ¶ ¶ 5, 6.  The Court finds that this testimony sufficiently establishes Fisher's personal knowledge of the subject at hand.  Fisher's testimony reflects the proper

12

elements of his position as Vice President and Corporate Counsel for plaintiffs.  From such vantage point, it is reasonable that Fisher's observations and knowledge of defendant's contractual relationship with plaintiffs would be accessible and, moreover, accurate.

Defendant also presents alleged evidence of Fisher's lack of personal knowledge by reference to letters written by plaintiffs' counsel, Michael C. D'Agostino, to defendant's counsel, Patrick M. Birney and Joseph M. Pastore, III, dated March 27 and March 30, 2006.[6]  Plaintiffs argue that the letters in question are irrelevant to the instant matter because they are in reference to the arbitration between defendant's affiliate, PEG Re, and plaintiffs' affiliate, DR.

As ruled, *supra*, the arbitration litigation between DR and PEG Re is not related to the litigation before the Court today.  That litigation – to which the letters in question refer – has been determined to be distinct from and irrelevant to defendant's breach of the Underwriting Agreement between plaintiffs and defendant.[7]  Accordingly, any correspondence between plaintiffs and defendant regarding Fisher's lack of personal knowledge as to the Reinsurance Agreement is irrelevant here.

---

[6]The March 27 letter states, *inter alia*, that "Any information in [Fisher's] possession would be second hand."  The March 30 letter asserts, *inter alia*, that "PEGI is well aware that Mr. Fisher did not become actively involved in this matter until after the agreements were implemented and litigation contemplated." Furthermore, on April 5, defendant again claims that plaintiffs' counsel, stated: "Any information in [Fisher's] possession would be second hand."

[7]The March 1, 2006 ruling held that the mandatory arbitration clause found in the Reinsurance Agreement did not compel the parties to the Underwriting Agreement to consent to arbitration because the Underwriting Agreement was distinct from and should not be read in conjunction with the Reinsurance Agreement.

Defendant also argues that Fisher's affidavit should be stricken insofar as it relies upon the e-mail correspondence between Ramon de Legorburu of PEGI and Craig Tirrell of Discover.  Defendant claims that this document is hearsay and is, therefore, inadmissible.

Rule 801(d) of the Federal Rules of Evidence defines statements which are not hearsay.  Specifically, Rule 801(d)(2) provides: "A statement is not hearsay if . . . . (2) The statement is offered against a party and is. . . (D) a statement by the party's agent or servant concerning the subject . . . ."  Fed. R. Evid. 801(d)(2).  "In order to introduce evidence of an out-of-court statement as nonhearsay under Rule 801(d)(2)(D), a party must lay a foundation by establishing: '(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency.'"  Marcic v. Reinauer Transportation Companies, 397 F.3d 120, 128-29 (2d Cir. 2005) (quoting Pappas v. Middle Earth Condominium Association, 963 F.2d 534, 537 (2d Cir. 1992)).

The Second Circuit has held that admissibility under this rule should be granted freely.  "Liberal admissibility of this sort of proof is grounded on certain premises.  One is that an employee is usually the person best informed about certain acts committed in the course of his employment . . . ."  Pappas v. Middle Earth Condominium Association, 963 F.2d at 537.  In Pappas, the Second Circuit demonstrated this liberal standard by admitting testimony of an unidentified employee, explaining that "circumstantial evidence" proved that there was an agency relationship between the witness and the employer.  "[C]ircumstantial evidence may establish the scope, as well as the existence, of the agency relationship."  Id. at 538.

14

Here, the circumstantial evidence concerning Ramon de Legoboru of PEGI and Craig Tirrell of DiscoverRe – the e-mail correspondence with their e-mail addresses designating where they may be located ("pegi.net" and "discover-re.net," respectively) combined with the subject matter of the e-mail itself – proves that there is an agency relationship between these individuals and defendant and plaintiffs, respectively. Accordingly, the Court finds this evidence is not hearsay pursuant to Rule 801(d)(2)(D).

Defendant also argues that the e-mail is inadmissible because it is not within the penumbra of Fisher's personal knowledge in that he was not a party to the correspondence.  The Court disagrees.  Fisher establishes the necessary foundation for his authentication of the e-mail in that one of his responsibilities was to review "the Plaintiffs' business records and correspondence with the Defendant."  He specifically refers to the e-mail as an example of this business correspondence. Fisher Supp. Aff., ¶ 6.  This, combined with the circumstantial evidence the Court has deemed establishes the agency relationships of the writer and recipient of the e-mail to the defendant and plaintiffs, respectively, provides the authentication necessary to find this evidence admissible.  The e-mail, therefore, is admissible.  Defendants' motion to strike will be denied.

**III.    Plaintiffs' Motion to Seal and Cross-Motion for Equitable Relief**

In support of its motion to strike, defendant attached three letters as purported evidence in support of its claim that Fisher lacked personal knowledge as to the Underwriting Agreement.  Plaintiffs argue that because these letters were produced as part of the arbitration proceeding between plaintiffs' affiliate, DR, and defendant's affiliate, PEG Re, they are controlled by the Confidentiality Agreement executed in the

15

course of that proceeding.  As such, plaintiffs assert, they do not pertain to the present matter, should not have been disclosed and should be removed from this proceeding.

In relation to this claim, plaintiffs also request that their objection and cross-motion be sealed.

It is well settled that the public has a presumptive right of access to the courts. This has been considered both a common law and a constitutional right pursuant to the First Amendment.  See Gambale v. Deutsche Bank AG, 377 F.3d 133, 140 (2d Cir. 2004).  "The presumption of access is based on the need for federal courts, although independent – indeed, particularly because they are independent – to have a measure of accountability and for the public to have confidence in the administration of justice." United States v. Amodeo, 71 F.3d 1044, 1048 (2d Cir. 1995).  "[W]hen a district court initially considers a motion to seal a file or to take other protective measures, it enjoys considerable discretion in determining whether good cause exists to overcome the presumption of open access to documents filed in our courts."  Geller v. Branic Int'l. Realty Corp., 212 F.3d 734, 738 (2d Cir. 2000) (emphasis in the original).

One possible exception to the presumption of open access is found in the instance of confidentiality agreements.  Courts do not discount the significance of confidentiality agreements, but they are still bound to consider the implications of the denial of public access to court documents.  Mitchell Health Technologies, Inc. v. Naturewell, Inc., 2003 WL 23200260, *4 (W.D.Wis.).  Confidentiality agreements "must yield when they are in tension with the truth-seeking process . . . ."  Id.

There is no dispute that the Confidentiality Agreement controls the arbitration proceeding between DR and PEG Re and refers to all "documents" produced therein.  It

16

is also undisputed that the three letters in question are included within the scope of the definition of "documents."  As such, plaintiffs argue, the three letters fall under the scope of the Confidentiality Agreement.  However, defendant claims that the letters do not relate to substantive issues within the arbitration proceeding and therefore are not subject to the provisos of the Confidentiality Agreement.  Alternatively, defendant claims that if the letters are considered within the confines of the Confidentiality Agreement, they may be produced because ¶ 11 of the Confidentiality Agreement permits the disclosure of documents to the present matter.

Paragraph 11 of the Confidentiality Agreement provides: "Nothing herein shall limit, impede and/or restrict the rights of either party in connection with the Federal action Discovery Re Managers, Inc. v. Preferred Employers Group, Inc. CV No. 3:05CV809, currently pending in the United States District Court in the District of Connecticut."  Defendant reads this provision as to permit disclosure of otherwise confidential documents for the purposes of the present litigation.

However, the Confidentiality Agreement also includes the provision that if there is a dispute between the parties as to the production of certain documents, the documents shall be presented to the arbitration panel for its ultimate decision regarding such production.  See Confidentiality Agreement, ¶ 7.[8]

Counsel for defendant never sought the arbitration panel's consideration of the issue in dispute.  Instead, defendant is relying upon the language of ¶ 11 for the admissibility of the documents in the present case.  The Court finds defendant's argument unpersuasive.

The Confidentiality Agreement does, as defendant asserts, clearly consider that arbitration information can be disclosed to this Court and to others when certain conditions are met.  The transcript of the January 13, 2006 Organizational Meeting delineates these conditions.

_____

[8]Paragraph 7 of the Confidentiality Agreement provides in relevant part: "If any person should conclude that for the purpose of this Arbitration, it needs to disclose Arbitration Information or the information contained therein or derived therefrom, to any person not specified therein . . . it may seek the consent of the other party to do so for specified documents and information. . . . If counsel cannot agree as to the disposition of such a request, the party seeking disclosure may make application to the arbitration panel for an order compelling production of the requested Arbitration Information.  Until and unless the arbitration panel rules in favor of the party on such an application, such documents or information may not be disclosed to any person not permitted by the Confidentiality Agreement.  In the event the application is granted, the person to be given access to the Arbitration shall agree to be bound to this Confidentiality Agreement, or as otherwise ordered by the arbitration panel."   Both parties appear to agree that ¶ 7 refers to the disclosure of confidential documents to venues other than the Arbitration Proceedings.

MR. PASTORE: Some of the changes [to the Confidentiality Agreement] that counsel and I worked towards were the result of the fact that there's a separate federal litigation which is going to have confidentiality obligations as well. We wanted to make sure we cross referenced it appropriately and didn't have the two mix and match.
. . . .

THE UMPIRE: Mr. Pastore and Mr. Horwich, generally is it safe to say that the primary change that was made is Paragraph 11?

MR. PASTORE: I believe that's correct . . . .

MR. HORWICH: Paragraph 7, I believe, is different and provides for a methodology by which one party can seek relief from the panel with respect to confidential information.

MR. PASTORE: That's correct. And that was done in part because of the need, perhaps, to use certain information in the Federal Court as well.

THE UMPIRE: So if there's a dispute about whether or not confidential information can be produced elsewhere between the parties, you're going to bring it to this panel for resolution?

MR. PASTORE: Correct.

MR. HORWICH: Correct.

Transcript, 1/13/06, at 24.

The Court finds that the dispute referenced above concerns the proper definition of the word "elsewhere." Is the Umpire referring to *any* other venue in which the parties would seek to utilize confidential information, including the federal litigation that is before the Court today? Or is the Umpire referring to any venue *other* than the federal court and the instant litigation? The Court finds that the Umpire's reference is global in scope and refers to *any other arena*, including the federal court cited by Mr. Pastore in the preceding paragraph. Thus, the parties are bound by the provision articulated in Paragraph 7 of the Confidentiality Agreement: "[i]f counsel cannot agree as to the

19

disposition of such a request, the party seeking disclosure may make application to the arbitration panel for an order compelling production of the requested Arbitration Information."  Conf. Agr., ¶ 7.  This the defendant has failed to do.

As a result, the Court will defer the decision regarding the sealing of the relevant documents to the arbitration panel, as provided by the Confidentiality Agreement.  The parties may request a protective order allowing the sealing of the documents pending the panel's decision.  The Court will deny plaintiffs' motion to seal and cross-motion for equitable relief without prejudice, pending a decision on this matter by the arbitration panel.

## IV.    PEG Reinsurance Company, Ltd.'s Application to Intervene as a Party

PEG Re, an affiliate of PEGI, has submitted its application to intervene as a party to the present litigation pursuant to Rule 24 of the Federal Rules of Civil Procedure.

PEG Re claims that, as a party to the Reinsurance Agreement with DR, it has an interest in the case before the Court that can only be protected and represented adequately if it is permitted to intervene.  It argues that the Underwriting Agreement is inextricably entwined with the Reinsurance Agreement as part of the larger schema of the Alternative Risk Program and that, accordingly, PEG Re shares an interest in the same pool of funds as plaintiffs in the current matter.  PEG Re claims that plaintiffs in the instant suit have interfered with funds in the trust account established by virtue of

the Reinsurance Agreement and that they are liable to PEG Re for same.[9]

Plaintiffs counter that this argument is yet another attempt for defendant and its affiliate, PEG Re, to claim that the Underwriting Agreement is to be read only in conjunction with the Reinsurance Agreement.  Plaintiffs assert that their interest in funds allegedly due to them by PEGI pursuant to the Underwriting Agreement is not included in or limited to any shared "pool of funds" created pursuant to the Reinsurance Agreement.

Here, PEG Re's interest is based upon the contingencies that plaintiffs shall prevail in the instant litigation, that the Court will determine that they are entitled to damages and that the damages will be funded through a trust account that is somehow affiliated with both the Underwriting Agreement and the Reinsurance Agreement.  In other words, the Court would have to find that there is, indeed, a nexus between the Underwriting Agreement and the Reinsurance Program. This the Court will not do.  In effect, by so doing, the Court would be intermingling two separate suits: the suit between plaintiffs and defendant over the issue of the breach of the Underwriting Agreement and the suit between PEG Re and DR over the issue of a breach of the

---

[9]In its counterclaim against plaintiffs, PEG Re asserts claims of: 1) conversion; 2) civil theft; 3) unjust enrichment; 4) money had and received; 5) civil conspiracy; and 6) a violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 38a-110a, et seq. ("CUTPA").

Reinsurance Agreement.  "[T]he rule [of intervention by right] is not intended to allow for the creation of whole new suits by intervenors." <u>Washington Electric Cooperative, Inc. v. Massachusetts Municipal Wholesale Electric Co.</u>, 922 F.2d at 97.  Because this is what PEG Re is attempting to do here, the Court will not approve its application for intervention.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for partial summary judgment [Doc. #25] is GRANTED as to Count One, breach of contract.  Defendant's motion to strike the affidavit of Jeffrey L. Fisher [Doc. #65] is DENIED.  Plaintiffs' motion to seal and cross-motion for equitable relief [Doc. #68] are DENIED without prejudice pending the arbitration panel's resolution of the matter.  PEG Re's application to intervene [Doc. #74] is DENIED.


Dated this 28th of September, 2006 at Bridgeport, Connecticut.


_____/s/_____
Warren W. Eginton
Senior United States District Judge